IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MILDRED V. BIBBS | : | CIVIL ACTION |
| --- | --- | --- |
| | : | NO. 10-0346 |
| v. | : | |
| | : | |
| SECURITY ATLANTIC MORTGAGE CO., INC.; DIAMOND INDUSTRIES, INC.; AND BAC HOME LOAN SERVICING, L.P. | : | |

O'NEILL, J.                                                SEPTEMBER 1, 2010

## MEMORANDUM

Plaintiff Mildred V. Bibbs filed a ten count amended complaint on May 3, 2010 seeking equitable relief and damages for alleged violations of, inter alia, the Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (Count I); violations of the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639, et seq. (Count II); fraud (Count IV); violations of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, et seq. (Count V); civil conspiracy (Count VI); and concerted tortious conduct (Count VII). Defendants BAC Home Loan Servicing, L.P. and Security Atlantic Mortgage Co., Inc. filed separate partial motions to dismiss. Defendant Diamond Industries has filed its answer. I have before me BAC's and Security Atlantic's motions, plaintiff's responses and defendants' replies.

## BACKGROUND[1]

In June 2008, plaintiff, a 73-year-old woman, saw an advertisement in the newspaper for

---

[1] I have recited only a portion of the facts alleged in the complaint as the entire story is not relevant to disposing of the present motions. In reciting the factual background of this case, I take as true all well-pleaded factual allegations in plaintiff's first amended complaint. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (setting forth post-Twombly standard of review).

"Government Insured Loans" and "HUD/FHA Insured Loans" to finance home repairs. She contacted Diamond Industries and on June 21, 2008 Barry Hecht, a representative of Diamond, came to her home. She explained that her roof and plumbing system needed to be repaired. After Hecht surveyed her entire home, he persuaded plaintiff that she needed additional work done and told her that Diamond Industries could make it "like new." Plaintiff told Hecht that she did not think she could afford or qualify for a loan to pay for all of the suggested work because her income was limited. Hecht assured her that Diamond Industries would get her a loan. He prepared a $48,400.00 contract for all of the suggested repairs. Hecht and plaintiff signed the contract that day.

Subsequently, Diamond Industries informed Security Atlantic of the contract. Security Atlantic began the process of securing financing. Rather than preparing a home repair loan form, Security Atlantic used a Federal Housing Authority refinancing form. This was done because plaintiff's outstanding debts and liabilities would prevent her from securing a loan designed for home repairs. Security Atlantic obtained a loan for more than the contract amount. The loan included a substantial obligation to pay fees, costs, debts and liabilities other than the home repairs plaintiff had authorized.

Over a month after her initial meeting with Hecht, a man arrived unannounced at her home one evening and stated he was working with Diamond Industries on plaintiff's loan. He was a settlement agent from JRS Settlement. The agent had been hired by Security Atlantic, Merit Finance and Diamond Industries to conduct the settlement in such a manner that plaintiff would remain unaware of the mortgage being placed on her home, the increased size of the debt she was incurring and the decreased amount of money which had actually been obtained to

conduct home repairs.

Ultimately, Diamond Industries began work on the home. However, the workmanship was so poor and plaintiff's home was left in such a state of disrepair she was forced to abandon it. Prior to her interactions with Diamond Industries, plaintiff had owned her home free and clear of any mortgage. Subsequently, a first lien mortgage was placed on her home. BAC was assigned the mortgage in May 2009 and immediately initiated foreclosure proceedings.

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a Court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted). The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Wilkerson v. New Media Tech. Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556). The Court of Appeals has recently made clear that after Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1955, 173 L. Ed. 2d 868 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must

now set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949). The Court of Appeals also set forth a two part-analysis for reviewing motions to dismiss in light of Twombly and Iqbal: "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 210-11 (quoting Iqbal, 129 S. Ct. at 1950). The Court of Appeals explained, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Id. (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1949.

## ANALYSIS

**I.      Truth In Lending Act (Count I)**

Congress enacted TILA in 1968 to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). Plaintiff alleges defendants Security Atlantic and BAC violated certain of those disclosure requirements. Specifically, TILA requires that the creditor accurately disclose to the consumer, inter alia, the finance charge. 15 U.S.C. § 1638(a) (2008). "In a transaction secured by real property or a dwelling, the disclosed finance charge and other disclosures affected by the disclosed finance charge (including the amount

4

financed and the annual percentage rate) shall be treated as accurate if the amount disclosed as the finance charge: (i) [i]s understated by no more than $100; or (ii) [i]s greater than the amount required to be disclosed." Id.

Plaintiff alleges that the finance charge, and consequently the amount financed and the annual percentage rate, were inaccurately reported on the TILA Disclosure Statement. First Am. Compl. ¶¶ 142, 146, 148. Specifically, she alleges the TILA Disclosure Statement computed by Security Atlantic reported a $4,955.21 finance charge. Id. at ¶ 146. However, the alleged actual finance charges as reflected in the HUD-1 Settlement Statement were much higher:

a. Loan Origination Fee to Merit Finance (line 801): $588.70
b. Loan Discount Fee to Merit Finance (line 802): $1890.12
c. Appraisal Fee to Merit Finance (line 803): $500.00
d. Application Fee to Merit Finance (line 815): $500.00
e. Upfront MIP to HUD (line 902): $883.05
f. Hazard Insurance Premium for Years (line 903): $575.00
g. Hazard Insurance 4 Months (line 1001): $191.68
h. Flood Cert to Security Atlantic (line 1303): $11.00
i. Est. Settlement Fee (line 1304): $750.00
j. JRS Settlement (line 1502): $5226.28

Id. at ¶ 143. The total of items a-j is $11,115.83. The difference between the alleged actual finance charge assessed by Security Atlantic according to the HUD-1 Settlement and those reported on the TILA Disclosure Statement is $6,160.62. Thus, plaintiff's TILA Disclosure Statement allegedly understated the actual finance charge by more than $100.

BAC and Security Atlantic move to dismiss plaintiff's TILA cause of action challenging her inclusion of certain fees–specifically, items c, f, g, h, and j–and the accuracy of item i in the calculation of the actual finance charge. Defendants rely on a HUD-1 Settlement Statement attached as an exhibit to their memoranda to identify what they contend are inaccuracies between

5

plaintiff's allegations and the fees reflected on their version of the HUD-1. They urge me to consider their HUD-1 even though it was not attached to the complaint and clearly it is not the HUD-1 upon which plaintiff relied in her complaint. For the following reasons, I will not consider defendants' alternative HUD-1.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." <u>Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). Furthermore, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." <u>Id.</u> (citations omitted).

BAC argues I may consider its HUD-1 "as a document incorporated by Plaintiff's numerous references to it." BAC's Memo. 8 n.1 (<u>citing</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 222 (2007)). In deciding a motion to dismiss, District Courts may consider documents incorporated into the complaint by reference. Here, however, plaintiff has not referenced defendants' document. Rather, plaintiff references a HUD-1 Settlement Statement which allegedly contains different finance charges than those reflected in the defendants' version. <u>See</u> Am. Compl. ¶ 143; <u>see</u> <u>also</u> Pl.'s Memo. In Opp. Ex. 1.

Security Atlantic makes a similar argument. It contends that its HUD-1 controls because it was referenced by the plaintiff and contradicts her allegations. Security Atlantic Memo. 6 n.7. Security Atlantic relies on <u>Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny Cnty.</u>, Civ. A. No. 06-1064, 2007 U.S. Dist. LEXIS 23626, at *14 (W.D. Pa. Mar. 30,

2007), which stands for the proposition that the contents of a document attached to a complaint control over any contradictory allegations. Id. Here, plaintiff's allegations do not contradict any exhibits she attached to her complaint. Rather, Security Atlantic contends that her allegations contradict its version of the HUD-1. Because its argument is premised on a question of fact, i.e. whether plaintiff's HUD-1 is accurate, I find Security Atlantic's argument unpersuasive.

Finally, BAC argues that I may consider its HUD-1 because plaintiff does not claim that her signature, the settlement agent's signature or the date next to the settlement agent's signature appearing on that form are not authentic. BAC notes in its reply that the HUD-1 which plaintiff attached to her memorandum in opposition and which she contends is the basis of the allegations in her complaint is neither signed nor dated. While plaintiff appears not to dispute the authenticity of the signatures or date on defendants' HUD-1, it is clear that she disputes the authenticity of defendants' HUD-1 based on the vast discrepancies between the two versions' finance charges. As stated above, I may only consider indisputably authentic documents attached as an exhibit by a defendant to its motion. Pension Ben. Guar. Corp., 998 F.2d at 1196. As plaintiff disputes the authenticity of defendants' HUD-1, I cannot consider that document at this stage of the proceedings. See also Bernardo v. Cont'l Serv. Grp., Inc., Civ. A. No. 10-1388, 2010 WL 2649942, at *3 (E.D. Pa. Jun. 30, 2010).

Considering only the amended complaint, plaintiff's allegations plausibly suggest that she is entitled to relief. Plaintiff alleges that the TILA Disclosure Statement reflected $4,955.21 in finance charges. Thus, if the actual charges exceeded $5,055.21, the disclosure would be inaccurate because it would have underestimated the finance charge by $100. Defendants do not dispute $3,861.87 of alleged finance charges (i.e., the total of items a, b, d and e). Furthermore,

7

plaintiff alleges a $750 "Est. Settlement Fee" (item i) and a $5,226.28 fee to "JRS Settlement" (item j). The sum of these charges–$9,838.15–is sufficient to state a claim for relief.

BAC and Security Atlantic rely on their version of the HUD-1 to argue that the settlement fee to JRS was only $300, not $5,976.28. As discussed supra, I will not consider this evidence as it is outside of the scope of the pleadings. Therefore, the $5,976.28 may be included in the calculation of the finance charge and accordingly, at this stage of the proceedings I will deny defendants' motions insofar as they seek dismissal of the TILA claim.

## II.     Home Owner Equity Protection Act (Count II)

The HOEPA amendment to TILA was passed in 1994 in response to "increasing reports of abusive practices in home mortgage lending." Cooper v. First Gov't Mortg. and Investors Corp., 238 F. Supp. 2d 50, 54 (D.D.C. 2002) (citations omitted). With respect to certain high cost mortgages, HOEPA requires additional disclosures beyond those required by TILA. See 15 U.S.C. § 1639. Plaintiff alleges that the HUD-1 Settlement Statement reflects that the total of the points and fees associated with her loan exceed 8% of the total loan amount making it a HOEPA loan. Am. Compl. ¶ 160; see 15 U.S.C. § 1602(aa)(1). Again, defendants rely on their version of the HUD-1 to argue that plaintiff failed to state a claim under HOEPA. For the reasons discussed above, I cannot rely on that document.

Plaintiff alleges the disclosed total amount of the loan was $59,753.00, eight per cent of which is $4,780.24. Item j, the JRS Settlement fee, alone is alleged to be $5,226.28. Thus, after considering only the amended complaint and not the disputed contents of the HUD-1, plaintiff has stated a claim under HOEPA. Accordingly, I will deny defendants' motion with respect to Count II.

### III. Fraud, UTPCPL, Civil Conspiracy and Concerted Tortious Conduct

Finally, BAC moves to dismiss plaintiff's fraud, UTPCPL, civil conspiracy and concerted tortious conduct claims arguing that plaintiff has failed to allege the necessary wrongful conduct on the part of BAC to support any of these theories.

#### A. Overview of TILA and HOEPA's Assignee Liability Provisions

While TILA and HOEPA each provide borrowers with a cause of action against assignees who engage in predatory lending tactics, the standards for assignees are different for non-HOEPA and HOEPA transactions. A civil action may be maintained against an assignee of a non-HOEPA transaction, see 15 U.S.C. § 1641(a), but the assignee is liable for damages only if: "(A) the violation for which such action or proceeding is brought is <u>apparent on the face of the disclosure statement</u> provided in connection with such transaction pursuant to this subchapter; and (B) the assignment to the assignee was voluntary." 15 U.S.C. § 1641(e)(1)(A)-(B) (emphasis added).[2] On the other hand, when the HOEPA amendment was passed, it expanded liability for assignees of HOEPA mortgages such that they

> shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the . . . assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a [HOEPA] mortgage . . . .

---

[2] A "violation is apparent on the face of the disclosure statement if-(A) the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement; or (B) the disclosure statement does not use the terms or format required to be used by this subchapter." 15 U.S.C. § 1641(e)(2)(A)-(B).

15 U.S.C.A. § 1641(d)(1). Thus, assignees of HOEPA mortgages are subject to a broader set of claims than assignees of non-HOEPA mortgages. Whereas assignee liability for non-HOEPA mortgages is limited to violations that are apparent on the face of the disclosure statement, assignees of HOEPA mortgages share the same liability as the creditor. See Cooper, 238 F. Supp. 2d at 55-56. HOEPA provides assignees an additional defense not available to creditors (i.e., the assignee proves that a reasonable person exercising ordinary due diligence could not determine the loan was a HOEPA loan) and HOEPA limits the amount of relief for which assignees are responsible. See 15 U.S.C.A. § 1641(d)(2)-(3).

  **B.**  **Scope of HOEPA's Assignee Liability Provision**

The Court of Appeals has not interpreted the scope of an assignee's liability that arises under HOEPA and District Courts are divided as to whether the assignee liability provision reaches all or only some claims. See In re Community Bank of Northern Virginia, 418 F.3d 277, 304 (3d Cir. 2005).

The Congressional record reflects the purpose behind the legislation:

> By imposing assignee liability, the Committee seeks to ensure that the High Cost Mortgage market polices itself. Unscrupulous lenders were limited in the past by their own capital resources. Today, however, with loans sold on a regular basis, one unscrupulous player can create havoc in a community by selling loans as fast as they are originated. Providing assignee liability will halt the flow of capital to such lenders.
>
> This provision mirrors a rule promulgated by the Federal Trade Commission for "consumer installment" loans such as home improvement or auto loans. The F.T.C. rule has not significantly restricted the flow of consumer credit and or interfered with the securitization of auto loans. The Committee expects that establish [sic], trustworthy originators sell their loans by entering into recourse agreements with the purchasers.

S. Rep. 103-169, reprinted in 1994 U.S.C.C.A.N. 1881 at 1912.

Some District Courts examining the plain language of the statute along with HOEPA's legislative history and Congress' intent in passing the amendment have held that the statute encompasses an expansive set of claims for which an assignee of a HOEPA mortgage can be held liable. In Bryant v. Mortgage Capital Resource Corp., 197 F. Supp. 2d 1357, 1364 -1365 (N.D. Ga. 2002), the District Court examined the legislative history reflecting Congress's intent behind the assignee liability provision and concluded

> [T]he court finds that Congress intended to place the increased burden of inquiring into the legitimacy of the lending practices engaged in by the original lender upon the assignees of HOEPA loans. In so doing, Congress sought to "halt the flow of capital" to original lenders who engaged in predatory lending practices harmful to consumers by providing for assignee liability under HOEPA. Such an approach was intended to encourage investors in the secondary market for HOEPA loans to more carefully scrutinize the backgrounds and qualifications of those with whom they choose to do business. Moreover, Congress' approach allocates to the assignee the cost associated with the misconduct of the original lender in such instances where the assignee fails to inquire into or otherwise discover the deceptive and unlawful practices engaged in by the original lender.

Id. (footnotes and citations omitted); see also Cooper, 238 F. Supp. 2d at 54 ("Congress intended to subject high cost mortgage (HOEPA loan) assignees to a more expansive standard of liability than provided pursuant to TILA. The legislative history of HOEPA demonstrates that Congress enacted HOEPA to force the high cost mortgage market to police itself." (citing Bryant, 197 F. Supp. 2d at 1364)). Thus, these Courts have permitted plaintiffs to proceed against assignees of HOEPA loans with fraud and other claims even when the plaintiffs have not alleged the assignees' participation in the fraud. See Bryant, 197 F. Supp. 2d at 1365 (permitting plaintiffs

11

to proceed with claims of fraud and violations of state RICO laws against defendant assignee based solely upon the conduct of the original issuer of the loans); Durham v. Loan Store, Inc., No. 04 C 6627, 2006 WL 3422183, at *7 (N.D. Ill. Nov. 27, 2006) (distinguishing cases holding that a party must actually have committed the fraud in order to establish common law fraud where those cases did not involve a HOEPA loan because "HOEPA loans are given heightened liability to discourage fraud in such cases, extending extra liability to assignees").

Other District Courts have applied HOEPA's assignee liability provision narrowly, dismissing claims where the assignees were not alleged to have been perpetrators of the fraud or state statutes expressly limited an assignee's liability. In Dowdy v. First Metropolitan Mortg. Co., No. 01C7211, 2002 WL 745851, at *3 (N.D. Ill. Jan. 29, 2002), the Court dismissed the plaintiff's claim against the assignees of a HOEPA loan. It reasoned, "Illinois law is absolutely clear on the point that . . . assignees of the allegedly fraudulent mortgage and not the actual perpetrators of the fraud cannot be held liable under [the Illinois Consumer Fraud Act] for [the creditor's] alleged fraud." Id. Without reviewing the statutory language or history, the Court stated, "this court does not believe that § 1641(d) entitles plaintiffs to new rights or claims that would not otherwise be cognizable under the law." Id. Similarly, in Dash v. FirstPlus Home Loan Owner Trust 1996-2, 248 F. Supp. 2d 489, 501 n.13 (M.D.N.C. 2003), the Court stated in dicta that the plaintiffs' state law claim against the assignee for unfair and deceptive trade practices would fail because the plaintiffs could not demonstrate that the assignee engaged in an unfair or deceptive act. The Court noted that under North Carolina law only the perpetrator of a fraud–and not a subsequent assignee–can be held liable for an unfair or deceptive trade practice. It summarily concluded, "HOEPA does not create a new right or claim that would not otherwise

be cognizable under the law." Id.; see also Baker v. Century Financial Group, Inc., No. 01-0903-CV-W-SOW-ECF, 2001 U.S. Dist. LEXIS 24320, at *7 (W.D. Mo. Nov. 19, 2001); Vandenbroeck v. ContiMortgage Corp., 53 F. Supp. 2d 965, 968 (W.D. Mich. 1999).

Judge Sigmund undertook to reconcile these cases in a proceeding where the plaintiff sought to hold assignees of a HOEPA loan liable for the creditors' alleged violation of the Real Estate Settlement Procedures Act. In re Harvey, No. 02-32412, 2003 WL 21460063 (Bankr. E.D. Pa. Jun. 9, 2003). After reviewing the Congressional intent behind HOEPA and examining some of the cases limiting assignee liability, the Bankruptcy Court concluded that "it appears that an analysis of the 'other law' being invoked is a necessary element of determining whether the assignee will be held liable for the wrongs of its assignor." Id. at *6. Ultimately, the RESPA claim was allowed to proceed because nothing in that statute specifically prohibited assignee liability and permitting the plaintiff to proceed with her claim was consistent with Congress's intent "[t]o provide the additional protection it viewed as necessary." Id. at *7.

This approach had previously been followed in In re Barber, 266 B.R. 309 (Bankr. E.D. Pa. 2001), where the Court permitted a UTPCPL claim against an assignee but not a Equal Credit Opportunity Act, 15 U.S.C. § 1691 et. seq., claim because the "ECOA specifically eliminates an assignee's liability for ECOA violations unless the assignee participated in the violation or had reasonable notice of the act that constituted the violation." In re Harvey, 2003 WL 21460063, at *6. The Barber Court relied on the "general rule that 'a more specific statute covering a particular subject is controlling over a provision covering the same subject in more general terms . . . . Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." In re Barber, 266 B.R. at 321

(quoting In re Sullivan, 254 B.R. 661, 666 (Bankr. N.J. 2000)) (citing Coady v. Vaughn, 251 F.3d 480, 484 (3d Cir. 2001) ("The rationale for this canon is that a general provision should not be applied when doing so would undermine limitations created by a more specific provision.") and Selected Risks Ins. Co. v. Kobelinski, 421 F. Supp. 431, 434 (E.D. Pa. 1976)).

Plaintiff, as discussed supra, adequately alleges that the mortgage qualifies as a HOEPA mortgage because the total of the points and fees associated with her loan exceeded 8% of the total loan amount. She also alleges that BAC is an assignee of the loan. Am. Compl. ¶ 110-111. BAC does not raise the statutory defense that it could not have determined that it had been assigned a HOEPA mortgage based on an examination of the documentary evidence. See 15 U.S.C.A. § 1641(d)(1). Rather, it argues the claims against BAC must be dismissed because plaintiff did not plead facts alleging BAC's role in the conspiracy, BAC's concerted tortious acts, fraud committed by BAC or any wrongdoing by BAC giving rise to a UTPCPL claim. BAC does not contend that assignee liability has been specifically abrogated with respect to any of these four claims and none of the parties briefed this legal issue which is the relevant question that I have to decide. Indeed, as noted above, assignee liability for UTPCPL under section 1641(d) was affirmatively permitted in Barber. Furthermore, I cannot conclude that there are no circumstances under which a fraud, conspiracy or concerted tortious action claim could be maintained against BAC in light of HOEPA's broad assignee liability provision. Accordingly, I will not dismiss Counts V-VII but will permit the parties to proceed to discovery on these issues and address them either in subsequent dispositive motions or at trial.

An appropriate Order follows.